**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE APPLICATION OF MAKHPAL**
**KARIBZHANOVA FOR JUDICIAL**
**ASSISTANCE PURSUANT TO 28 U.S.C.**
**§ 1782**

**Case No.  21-442**
**ECF Case**

---

### MEMORANDUM OF LAW IN SUPPORT OF APPLICATION
### FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Lewis Baach Kaufmann Middlemiss PLLC, acting on behalf of Makhpal Karibzhanova ("Applicant" or "Makhpal"), respectfully applies for an order of judicial assistance, pursuant to 28 U.S.C. § 1782, appointing John W. Moscow[1] as Commissioner of the Court to issue subpoenas to obtain testimony and documentary evidence to assist in discovery for use in prospective Kazakhstan civil proceedings.

Makhpal Karibzhanova is a citizen of Kazakhstan and is the former wife of a wealthy and politically-connected Kazakh businessman, Aidan Karibzhanov ("Aidan").  During 20 years of marriage, Makhpal was repeatedly and constantly subjected to physical, emotional, and psychological abuse.  On May 15, 2018, her marriage to Aidan was dissolved by a Kazakh court. At the time of the divorce, Aidan refused to discuss a meaningful settlement regarding the division of marital property.  Instead, he pushed through the divorce, likely by corrupt means, without any division of marital property, and has since denied Makhpal access to almost all marital property, all of which is under Aidan's control or that of his trusted nominees.  Kazakh law allows an action for division of marital property to be commenced as a separate proceeding from the divorce action

---

[1] Mr. Moscow is senior counsel at the firm Lewis Baach Kaufmann Middlemiss PLLC and is admitted to appear before the courts in the Southern District of New York.  Mr. Moscow spent over thirty years as a prosecutor at the New York County District Attorney's Office working with Robert M. Morgenthau, where he founded and supervised the bureau responsible for the prosecution of international economic crime, known colloquially as DANY Overseas.

itself if the parties are unable to come to an amicable settlement.  Makhpal hoped that Aidan would prove reasonable once the marriage had ended; however, Aidan has shown no interest in reaching a settlement.  Instead, he has repeatedly sought to intimidate Makhpal to keep her from asserting her rights to equitable division of the marital estate.  Given Aidan's refusals to engage in settlement talks, Makhpal had no choice but to bring an action in Kazakhstan seeking judicial division of marital assets.

Makhpal is now in the process of documenting the true value of the marital estate for the Kazakh court's benefit.  Aidan has shown that he cannot be trusted to declare accurately the nature and extent of his wealth.  A great deal of Aidan's wealth is held in offshore structures and through nominee ownership around the world, making it necessary to gather evidence from a number of countries, including the United States, the United Kingdom, Switzerland, the United Arab Emirates, and Singapore, as well as Kazakhstan and a number of offshore jurisdictions.  Given the importance of the United States, and specifically Manhattan, as a center for global finance, many relevant records will be found with global financial institutions based in Manhattan, including bank records, real estate records, and records from at least one investment advisor registered with the Securities and Exchange Commission ("SEC"), as well as offshore funds also subject to the jurisdiction of the SEC and, therefore, subject to U.S. jurisdiction.[2]

---

[2] This application presents the background of Makhpal and Aidan's marriage and divorce, as well as a general overview of Aidan's wealth.  As with any significant asset tracing matter, Applicant envisions this investigation as an ongoing and iterative process.  It would be an almost Sisyphean task to attempt to catalogue every known or suspected asset in Aidan's galaxy of shell companies, trusts, and nominee owners.  Rather, Applicant presents certain specific relatively large-scale items she will seek to subpoena, but also presents general descriptions of Aidan's wealth as examples of areas that may lead to issuance of subpoenas based upon further investigation.  When specific subpoenas are issued, the subpoenaed parties will have ample access to legal  process to move to quash or modify.  Thus, this application does not seek to identify or present specific subpoenas or targets for discovery, but rather seeks appointment of the Commissioner who will issue specific subpoenas relevant to the foreign cause of action at a later date pursuant to the proposed appointment.

## FACTUAL BACKGROUND

### A.      The Marriage and Divorce

Makhpal was born in Kazakhstan in 1974.  Her father is a famous Kazakh scientist and academician.  By 1993, Makhpal was a professional ballerina, dancing as the Prima Ballerina in Kazakh State Academic Opera and Ballet Theatre named Abay.  Makhpal Aff. ¶¶ 4-5.  She met Aidan in 1996 when he was a young bank employee who had recently graduated from university and was just embarking on his career.  *Id.* ¶ 6.  At that time, he had little money.  *Id.*  He was living with his parents at his parents' apartment and did not own his own car.  *Id.*  Nonetheless, he pursued a relationship with Makhpal with great fervor.  *Id.* ¶ 7.  She refused his marriage proposals several times to focus on her career as an international fashion model.  *Id.*  To that end, in 1996, Makhpal organized a major international fashion show in Kazakhstan featuring many couture fashion houses.  *Id.* ¶ 5.  By 1997, she had signed a contract with Ford Models, an American international modeling agency based in New York and Paris, and moved to Paris.  *Id.*  Her contract allowed her to earn $1,200 per hour and she appeared poised to sign a multimillion-dollar contract with a large international fashion house.  *Id.*

Aidan was a jealous suitor. He pressured her to return to Kazakhstan from Paris to marry him.  Eventually, she gave in and they were married on November 1, 1997.  *Id.* ¶¶ 7-8.

Shortly before their marriage, Aidan forced Makhpal to terminate her contract with Ford Models, which previously yielded her a large income and allowed her to be financially independent.  *Id.* ¶ 9.  Once they were married, Aidan completely forbade Makhpal from working in any professional capacity outside the home.  *Id.* ¶ 10.  She argued with him over this, but he was very angry and insisted that his wife would not work. Aidan repeatedly told Makhpal that he would earn so much money that Makhpal would never need income of her own.  Makhpal Aff. ¶ 10.

Their first daughter was born just ten months after their marriage, in 1998, and a second followed in 2001. *Id.* With Makhpal's support, Aidan's career began to take off around that time, as he profited from his primary role in the deals privatizing the Kazakhstan national telecom company and the state-owned Almaty International Airport. *Id.* ¶ 38. This was a precursor to many of the deals Aidan brokered in the decades to follow; deals involving privatization of public assets resulting in huge profits to politically connected insiders at the expense of the state. Makhpal was privy to the details of many of Aidan's business deals, some of which are set forth herein. *Id.* ¶ 37.

Aidan rose quickly and became closely associated with both political and business leaders. *Id.* ¶ 11. This was the beginning of his accumulation of great wealth. Around 2000-2001, Aidan and Makhpal bought a 5-acre plot of land in Almaty on which to build a new house. The purchase of the land as well as the construction of their home were financed by their joint family funds. *Id.* ¶ 12. Makhpal personally oversaw the entire process of the construction, design, and furnishing of the house. *Id.* The property and house were legally titled solely in Makhpal's name. *Id.* Aidan frequently stated that this house belonged entirely and personally to Makhpal. *Id.* Approximately four years after the purchase, in or about 2005, they moved into the newly-constructed house. *Id.* This would be their family and marital home until December 2016 when Aidan used intimidation and threats of physical harm to force Makhpal to give up her rights to the house and sign it over to their oldest daughter—who was entirely financially dependent on Aidan and had no choice but to follow all of his orders—without any compensation to Makhpal. *Id.* ¶¶ 12, 17. The intimidation worked. Fearing for her life, Makhpal signed over the home she lovingly designed and furnished. *Id.* ¶¶ 15, 17. In 2007 or 2008, Makhpal had received an offer to buy the house and property for $20 million. Aidan refused to allow Makhpal to consider the offer and stated that they already had

so much money that they did not need any more. Makhpal Aff. ¶ 13.

While Aidan would always tell Makhpal that half of what he was earning was hers, he steadfastly refused to provide her with her own bank or investment accounts, telling her it was too dangerous for her to hold such funds herself. By design, Aidan has now been able to retain all of the marital assets and leave Makhpal with nothing.

Throughout the course of their marriage, Makhpal caught Aidan having affairs on many occasions. Aidan would become enraged when she caught him with his lovers. *Id.* ¶ 14. She contemplated leaving him many times, but he would threaten, cajole, beg and cry to convince her to stay. *Id.* When Aidan drank, he became physically violent. On one occasion, in 2010 when Makhpal was pregnant with their third child, Aidan physically beat Makhpal severely in the stomach and head. He hit her so hard that he broke his hand. Shortly after the assault, Makhpal learned that the fetus did not survive, and she thereafter underwent surgery to remove the dead fetus from her womb. *Id.* On other occasions, he drunkenly boasted that he had the power to order someone's death and could easily have her killed. *Id.* ¶ 15. This intimidated Makhpal even further, as it was undoubtedly intended to do. On many occasions, she sought to leave Aidan, but he forbade it. He threatened that if she tried to leave, she would receive no money, that he would have her committed to a mental asylum in Kazakhstan, and that he would make sure she never saw her daughters again.[3] *Id.* ¶ 14.

---

[3] Numerous independent investigations and studies have documented the extremely high level of severe domestic violence toward women in Kazakhstan, including routine acts such as "punching, kicking or having objects thrown at them," as one 2018 UN survey stated. (The same survey said one in three Kazakh women "reported that they had experienced at least one act of controlling behavior by a partner in their lifetime.") The violence and domination Kazakh women experience is a product of the country's refusal to criminalize domestic violence, "which promotes impunity and sends a message that domestic violence is tolerated." https://eca.unwomen.org/en/digital-library/publications/2018/08/sample-survey-on-violence-against-women-in-kazakhstan. *See also* https://www.hrw.org/news/2019/10/17/kazakhstan-little-help-domestic-violence-survivors.

In the spring of 2016, to escape the daily abuse, Makhpal relocated to Europe and then to New York.  Makhpal Aff. ¶¶ 18, 20.  In 2017, Aidan filed for divorce but told Makhpal if she attempted to seek a judicial division of marital assets, he would have her killed or committed.  He falsely represented to the Kazakh court that he and Makhpal had reached an agreement on the division of marital assets, notwithstanding Makhpal's statements to the contrary.  *Id.* ¶ 23.  The Kazakh court entered an order dissolving the marriage.  Affidavit of Yevgeny Tikhonov ("Tikhonov Aff.") ¶ 5.  Makhpal appealed the decision of the Kazakh trial court based on misrepresentations that Aidan made to the court in the course of the proceedings.[4]  Makhpal believed that Aidan also bribed the judge overseeing the proceeding to rule in his favor.  Makhpal Aff. ¶ 24.[5]  On May 15, 2018, the Kazakh appellate court denied the appeal and the marriage was officially dissolved.  *See* Tikhonov Aff. ¶ 5.  Makhpal preserved her legal right to seek equitable division at a subsequent date.  Makhpal Aff. ¶¶ 23, 25 and Tikhonov Aff. ¶¶ 6-9.

While Aidan told the Kazakh court he and Makhpal would resolve the division of their marital property amicably, the reality was far different.  He made no substantive efforts to resolve Makhpal's legal entitlement to half of the marital estate.  Makhpal Aff. ¶ 26.  The settlement "offers" he made would have left Makhpal without access to money of her own, fully dependent on and subject to Aidan's will.  *Id.*  Beyond leaving Makhpal entirely at the mercy of her controlling ex-husband, the proposed settlement was far from equitable given that Aidan's net worth was estimated by Forbes in 2019 at $313 million.[6]  Makhpal Aff. ¶ 35.

---

[4] Judicial independence in Kazakhstan is virtually nonexistent; the wealthy routinely procure favorable court decisions through corruption.  According to a U.S. State Department report published in 2019:  "Corruption in the judicial system was widespread. Bribes and irregular payments were regularly exchanged in order to obtain favorable court decisions. In many cases the courts were controlled by the interests of the ruling elite…." https://www.state.gov/wp-content/uploads/2019/01/Kazakhstan.pdf

[5] This belief gained credence when, on April 28, 2021, the judge presiding over Aidan and Makhpal's divorce, Judge Svetlana Zholmanova, was arrested for taking bribes from litigants to resolve matters in their favor.  See https://acca.media/en/kazakhstan-another-judge-is-suspected-of-bribery/

[6] https://forbes.kz/ranking/object/59

The divorce was finalized in May 2018 without any division of marital assets.  Makhpal Aff. ¶¶ 23, 25 and Tikhonov Aff. ¶ 6.

In the years since the divorce was finalized, Aidan has continued to find ways to abuse Makhpal from afar.  In 2019, on her birthday, Makhpal received a series of videos from Aidan's bodyguard.  They showed workers destroying the home she designed and decorated and where she raised her daughters.  The home was razed to the ground.  Items with monetary value, that were marital property to be divided between them, were taken from the home and kept by Aidan.  Family items of no monetary value but great sentimental value to Makhpal were thrown in the rubbish heap and carted away.  Makhpal Aff. ¶ 17.

Makhpal was left with no choice but to bring an action in Kazakhstan seeking judicial division of marital assets.  Aidan's response has been an ongoing shadow campaign to intimidate Makhpal to keep her from asserting her rights and otherwise thwart her from seeking judicial intervention.  *Id.* ¶¶ 19-22, 26-34.  For example, in early 2021, Makhpal retained a lawyer employed by the Kazakh branch of a global financial services firm to act as an intermediary with Aidan to try to negotiate a solution short of litigation.  *Id.* ¶ 28.  At about the same time, evidence preservation letters relating to this matter were sent to certain of Aidan's business associates.  Declaration of John W. Moscow ("Moscow Decl.") ¶ 10.  Shortly thereafter, a senior partner in the global financial services firm informed Makhpal that he had received a telephone call from Michael Sauer, an Almaty-based banker who is associated with Aidan as a trusted individual in many capacities, including as a financial director of Visor Group and executive and/or owner with Verno Group.  The senior partner said that Sauer warned them that if the financial services firm helped Makhpal in any fashion, it would be finished in Kazakhstan.  Makhpal's intermediary was

forced to withdraw because senior management at the firm in Kazakhstan understood the threat to be credible.  Makhpal Aff. ¶¶ 28-29 and Moscow Decl. ¶ 11.

Makhpal then retained new counsel, Yevgeny Tikhonov.  Makhpal Aff. ¶ 29.  At what may reasonably be assumed to be Aidan's direction, Mr. Tikhonov was repeatedly denied access to public information and other government services required to file the lawsuit.  *Id.* ¶ 31.  Applicant also received information that, in the weeks preceding Makhpal's lawsuit, an attorney for Aidan frequented the Kazakh courthouse quietly seeking information about her potential action and trying to discern who might represent her.  *Id.* ¶ 30.  Despite Aidan's efforts, Mr. Tikhonov filed an action for equitable distribution of the assets on April 22, 2021 in the Medeu District Court of the City of Almaty.  *Id.* ¶ 32 and Moscow Decl. ¶ 9.  On April 23, 2021, the lawsuit appeared in the Kazakh court online system as formally registered.  Makhpal Aff. ¶ 32.  On May 6, 2021, the court dismissed Makhpal's suit with leave to refile.  *Id.* ¶ 33 and Moscow Decl. ¶ 9.  The Applicant reasonably believes that the court's dismissal of her action is further evidence of Aidan's efforts to interfere in her efforts to obtain an equitable division of their marital assets, in that the basis for dismissal was largely pretextual.  Makhpal Aff. ¶ 33.

Nonetheless, Mr. Tikhonov timely refiled the lawsuit on May 10, 2021.  *Id.* ¶ 34 and Notice of Submission at Ex. A; and Moscow Decl. ¶ 9.

B.     **Aidan's Wealth**[7]

Aidan has been involved in countless privatization and investment deals[8] and is at the upper echelon of the murky intersection of business and politics in Kazakhstan, an enormous mineral-rich former Soviet Republic dominated by a small elite that has amassed staggering wealth since independence in 1991.  Like many of the newly-wealthy Kazakh elite, Aidan's assets are structured to obfuscate his ownership through complex offshore structures, nominee shareholders, and double-accounting practices that purposefully frustrate efforts to calculate his true net worth. Many assets are commingled and held in the interests of both Aidan and other ultimate beneficiaries.  His assets are frequently moved through trusts and numerous bank accounts in the hopes of making their origin untraceable.  However, many of the banks used by Aidan are either headquartered in Manhattan or route funds through major U.S. banks in Manhattan via correspondent accounts. Moscow Decl. ¶ 23.

As noted above, Forbes Magazine has assessed Aidan's wealth in a number of articles.  It described him in May 2019 as the 26th richest businessman in Kazakhstan, with an estimated net worth of $313 million.[9]  In October 2020 (after Aidan had learned of the possible litigation against him), his wealth in Forbes was estimated at a lower, but still substantial, $201 million.  Moscow Decl. ¶ 12.   The Forbes article notes many aspects of Aidan's wealth: founder of Visor International, partner with China Power in a Kazakh wind farm, shareholder in Tengiz Service LLP (an oil transport service provider) held through Waterford International Holdings, and

---

[7] This is intended as a limited presentation of Aidan's wealth and business history.  In addition to the items mentioned herein, Aidan has also been involved in the privatization of the telecom sector in Nepal, Cambodia, and Kyrgyzstan, a gold mine in Kyrgyzstan, the acquisition of state-owned cement factories in Uzbekistan, investment through 1Malaysia Development Berhad (1MDB), and the development of a trans-Asia shipping center on the Kazakhstan-China border that is described as the largest "land port" in the world.

[8] Privatization deals, if structured as these deals were—to benefit the participants over the state and its citizens—are highly lucrative. State assets are sold at rock-bottom prices to purchasers who in turn re-sell or take them public at great gain.  They can net tens of millions of dollars or more in a very short time.

[9] https://forbes.kz/ranking/object/59

shareholder in a Virgin Islands-registered IT company held through Visor Investments.  Moscow Decl. ¶ 12.  While this is an impressive list of assets, and corroborates much of the information known to Makhpal, it fails to cover the majority of Aidan's other business interests, many of which are designed specifically not to be known to the public.

Despite his use of these complex structures, Makhpal's access to Aidan's business dealings and associates provides her with sufficient evidence to show that Aidan sits atop a vast global network of entities and accounts that directly and indirectly conduct business throughout the world. Some of these businesses, and evidence of their business activities, can be found in the United States and, specifically, in New York.  Makhpal Aff. ¶¶ 37, 41, 45, 50-55 and Moscow Decl. ¶¶ 16-18, 20-23.

As discussed further below, this estimate provided by Forbes substantially understates his actual net worth, which is likely somewhere between $1 billion to $2 billion according to: (i) statements Aidan made to Makhpal during their marriage, (ii) bank and investment account statements Aidan showed Makhpal when boasting of his wealth (the accounts were always held in the names of strawmen and shell companies), and (iii) estimates of Aidan's wealth described to Makhpal by certain of his business associates.  Makhpal Aff. ¶¶ 35-37 and  Moscow Decl. ¶ 13.

This application focuses on certain of the known assets with ties to the United States, as well as other offshore assets where we reasonably believe evidence of ownership and value can be gathered within this Judicial District.

### Verno Capital

Verno Capital Group Limited ("Verno Capital") is an offshore fund based in the Cayman Islands and owned and controlled by Aidan as well as his trusted nominees Marie-Hélène Bérard,

Dimitri Kryukov, Roland Nash, and Michael Sauer.[10]  Makhpal Aff. ¶ 39.  Verno Capital has close

ties to the Mubadala Fund, as discussed below.  Ms. Bérard is a French national and prominent

French politician and financier.  She was an economic advisor to two French prime ministers and

to Jacques Chirac when he was president.[11]  She was an early mentor to Aidan, and the two have

many business dealings together.  She sits on a number of boards and runs a number of investment

funds, including Verno Capital where she is a Director.  Ms. Bérard serves as a nominee owner for

bank accounts and assets held on behalf of Aidan.  *Id.*  Mr. Kryukov is a Russian national and, on

information and belief, is a resident of the United Kingdom and Switzerland.  He went to college

with Aidan and is a trusted nominee and partner of Aidan's. Aidan uses Kryukov as a nominee

owner for bank accounts and assets that Mr. Kryukov holds in the interests of Aidan.  *Id.*

Verno is one of Aidan's primary deposit and investment vehicle for his private funds.  *Id.*

According to its website, Verno is a group of investment funds specializing in investments in the

United Kingdom, Switzerland, the United Arab Emirates, Singapore, and Russia and the former

Soviet Union, as well as infrastructure projects in Kazakhstan.  Most of its related companies are

registered in offshore jurisdictions.  It is known to have offices in the United States, the United

Kingdom, Switzerland, the United Arab Emirates, and Russia.

Verno was in the news recently with regard to a lucrative deal it closed involving the

Almaty International Airport.  Aidan was involved in the privatization of the Almaty Airport in

2001 and maintained his ownership interest through subsidiary entities of Verno.  Makhpal Aff. ¶

40.  On April 29, 2021, Venus Airport Investments B.V. of Netherlands, a Verno subsidiary, sold

a majority ownership interest in the Almaty Airport to a French-Turkish consortium, TAV Airports

---

[10] https://web.archive.org/web/20101107074111/http://www.wealthbriefing.com/html/article.php?id=30650
[11] Before his conviction for bribery.

for $415 million.  Moscow Decl. ¶ 16.  The disposition of profits from this transaction (involving an asset acquired and held by Aidan during the marriage) will help illuminate Aidan's true wealth.

Of particular relevance, Verno Capital has a U.S. investment arm, Verno Capital Growth Fund LP ("Verno Capital Fund").  Verno Capital Fund is a limited partnership constituted in Delaware.  Verno Capital Fund has filed several Forms D (Notices of Exempt Offering) with the SEC since at least 2012.[12]  Aidan is personally named as a director on many of the filings.[13]  In addition, another Verno group entity, Verno Investment Management Limited ("VIML"), is an SEC-investment advisor act  registered investment advisor under the Investment Advisers Act and files Form ADV disclosures under 17 CFR 279.1.

VIML's April 2020 Form ADV declared that the fund raised more than $53 million in capital from five investors.[14]  The prior year, the fund declared more than $64 million from six investors.[15]  The forms are executed by Ms. Bérard in her capacity as director of the general partner.  The general partner is listed as Verno Partners II, with a registered address at Ugland House, George Town, Grand Cayman.  Ugland House a well-known provider of offshore corporate services and shell company address.  Verno Investment Management Limited is also at the same Ugland House address.  As a registered Investment Adviser with the SEC under CRD Number 163950, Verno is subject to all regulatory and enforcement powers held by the SEC.[16]  It also operated under the names Spring, Halcyon Portfolio Management, Halcyon Global Opportunities, and Halcyon PM.  It is managed by Specialized Research (UK) Limited.  The ultimate shareholder

---

[12] *See* https://www.sec.gov/Archives/edgar/data/1547508/000091957417003547/xslFormDX01/primary_doc.xml
[13] *E.g.*, https://www.sec.gov/Archives/edgar/data/1547508/000091957412002875/xslFormDX01/primary_doc.xml;
https://www.sec.gov/Archives/edgar/data/1547508/000091957413002848/xslFormDX01/primary_doc.xml;
https://www.sec.gov/Archives/edgar/data/1547508/000091957415003700/xslFormDX01/primary_doc.xml;
https://www.sec.gov/Archives/edgar/data/1547508/000091957417003547/xslFormDX01/primary_doc.xml
[14] https://www.sec.gov/Archives/edgar/data/1547508/000091957420002953/xslFormDX01/primary_doc.xml
[15] https://www.sec.gov/Archives/edgar/data/1547508/000091957419002998/xslFormDX01/primary_doc.xml
[16] https://reports.adviserinfo.sec.gov/reports/ADV/163950/PDF/163950.pdf

in Verno is Halcyon Portfolio Management Ltd., which claims to have over $500 million under management and is described as "an investment management company specializing in Russian, Former Soviet Union and Eastern European markets."[17]

Makhpal has participated in and/or witnessed numerous conversations between Ms. Bérard, Mr. Kryukov, Mr. Sauer, and Aidan, and thus has personal knowledge that they operate and control Verno Capital. Makhpal Aff. ¶ 39. (SEC filings list Ms. Bérard as a partner in Verno Capital Fund.[18]) Based on these conversations, Makhpal believes that Aidan has approximately $250 million in investments held through Verno, although his ownership is largely concealed through nominee ownership. *Id.*

Based on the foregoing, the Commissioner, once appointed, will subpoena financial institutions based in New York for all records reflecting securities held on behalf of or in the name of any Verno Capital entity, including Verno Capital Fund; all account administration documents presented to such financial institutions including disclosures of ownership, funds transfers into and out of such institutions, identities of owners and representatives who may be subpoenaed for further information, representations regarding politically exposed persons, and anti-money laundering proceedings; all corporate and securities filings of Verno Capital Fund and related entities; and communications between such financial institutions and individuals acting on behalf of Verno Capital and related entities.

### *Mubadala Fund*

Aidan has been at the center of a developing relationship between the Kazakhstan elite and the Abu Dhabi-based sovereign Mubadala Fund. Mubadala maintains an office in New York at

---

[17] https://icef.ru/tpost/a8nlocpdv1-junior-equity-analyst-at-halcyon-portfol
[18] https://reports.adviserinfo.sec.gov/reports/ADV/163950/PDF/163950.pdf

375 Park Avenue through its entity Mubadala Investment Co.[19]  Aidan and a vast network of associates use offshore investment vehicles, including Verno,[20] to structure joint investments and commingle their funds with Mubadala sovereign funds to be placed via banks in New York and Abu Dhabi.[21]  Moscow Decl. ¶ 16.

Makhpal participated in meetings with the principals involved in the Mubadala investments, including Aidan, Dimitri Kryukov, and Ms. Bérard.  Makhpal Aff. ¶ 41.  From those meetings, and from her conversations with Aidan, she learned much about the growth of the Mubadala relationship and Aidan's investments there.   These investments and relationships involve the highest levels of the Mubadala Fund.  Aidan was involved in the first meetings between Kazakhstan officials and Mubadala officials throughout 2010.  Attending these meetings with the top leadership of Mubadala were Aidan, Ms. Bérard, Dimitri Kryukov, and others.  *Id.*  The meeting had been set by the top political leadership of Kazakhstan, some of whom are involved in many deals with Aidan.  Aidan's group negotiated a nine-figure investment plan with Mubadala.[22] The relationship proved profitable, and the funds invested quickly increased into the billions.[23]  In August 2011, Aidan and Mr. Kryukov booked a two-week trip from Croatia to Greece on a chartered yacht to celebrate the Mubadala investment.  Makhpal was also included in this trip, where the Mubadala investments was a frequent topic of conversation.  Makhpal Aff. ¶ 41.

From her participation in conversations with Aidan, Makhpal is aware that Aidan secretly invests side-by-side with other Kazakh elites in Mubadala-related interests using a number of

---

[19] *See* https://www.mubadala.com/en/contact-us
[20] https://ivypanda.com/essays/mubadala-and-masdar-companies-development/
[21] *See* https://www.bankdhofar.com/UploadedFiles/InvestmentPress/en-GB/1_BankDhofar_Morning_Note-1_Dec.pdf; and https://ivypanda.com/essays/mubadala-and-masdar-companies-development/
[22] *See* https://www.bankdhofar.com/UploadedFiles/InvestmentPress/en-GB/1_BankDhofar_Morning_Note-1_Dec.pdf
[23] https://www.reuters.com/world/middle-east/abu-dhabi-mubadala-invested-record-amount-2020-eyes-aluminium-ipo-ceo-2021-04-12/

strawmen to conceal his interests.  *Id.*  Some of the funds invested with Mubadala have been used to purchase real estate assets in the United Kingdom and the United States.  *Id.*  Makhpal believes that some of the Mubadala profits were used to finance Aidan and Mr. Kryukov's vacation, flowing through offshore accounts controlled by Aidan and Mr. Kryukov to an American bank in Florida via correspondent accounts in New York.  *Id.*

Based on the foregoing, the Commissioner, once appointed, will subpoena Mubadala's New York office and financial institutions based in New York doing business with Mubadala globally for records reflecting securities held on behalf of or in the name of entities and investors affiliated with Aidan and his network of nominees and straw owners; all account administration documents relating to same including disclosures of ownership, funds transfers into and out of financial institutions, identities of owners and representatives who may be subpoenaed for further information, representations regarding politically exposed persons, and anti-money laundering concerns; all corporate and securities filings of Mubadala and related entities; and communications between such financial institutions and individuals acting on behalf of Mubadala.

### Kaz Minerals PLC (Formerly Kazakhmys PLC)

Aidan's wealth also derives from deals involving privatization of one of Kazakhstan's most valuable state assets—mineral rights owned by Kaz Minerals PLC, a public company whose shares are traded on the London Stock Exchange and in the United States through American Depositary Receipts registered with the SEC by JP Morgan Chase Bank NA.[24]  Makhpal Aff. ¶ 42.

One such deal where Aidan earned tens of millions of dollars involved the sale of the Koksay (also spelled Koksai) copper mines.  Applicant possesses documents relevant to that transfer, and also was present when the deal was discussed by Aidan and his partners, including

---

[24] https://www.sec.gov/Archives/edgar/data/1438929/000119380519001763/e618893_f6ef-kmp.htm

Vladimir Kim and Eduard Ogai.  *Id.*  The disposition of the profits from the deal was also hidden, with funds from the deal being used to buy valuable properties in the United States and United Kingdom through the use of shell companies and strawmen.  *Id.*

The Koksay deal involved the sale of Kazakh mineral rights through a number of shell company mergers and rights transfers.  This complex transaction involved the transfer of rights and ownership interests back and forth between a number of Dutch and Kazakh entities bearing similar names to hide ownership and profits from the deal.  The entities were controlled by nominees, but the true ownership remained with Aidan and his confederates, including Vladimir Kim and Eduard Ogai.  Meanwhile, the nominee owners set up accounts to receive the outsized profits from the deal.  *Id.*  Because some of the profits were used to purchase properties in the United States, the Commissioner will follow the money trail back from banks and real estate service providers in Manhattan to the original sources.

As with many of Aidan's deals, profits from Koksay were moved through various layers of shell companies and offshore accounts, many of them set up and managed by the network of private banks and bankers set forth in the banking relationships section below.  To the extent this network of accounts was used to transfer funds into the United States, the Commissioner will seek to identify and trace such funds to establish a portion of Aidan's wealth.

A similar privatization deal also provided tremendous profits to Aidan and his partners: the acquisition and exploitation of another Kaz Minerals PLC asset, the East Akzhar oil field. Additionally, service contracts were awarded to companies controlled by Aidan and his colleagues, allowing them to reap tens of millions of dollars in additional profits.  The profits from this project were channeled to insiders who set up and controlled the deal: Aidan, Mr. Kim, and Mr. Ogai. Makhpal Aff. ¶¶ 42, 45.

In an effort to impress her, Aidan on a number of occasions showed Makhpal his computer screen listing assets and bank accounts under his control, and these screens included extensive holdings in Kaz Minerals PLC.  *Id.* ¶ 36.  As was done with the Koksay copper mine profits, funds from the East Akzhar project were used to purchase valuable real estate in the United States and United Kingdom through strawmen and shell companies.  *Id.* ¶ 42.

### Paladigm Group

Similar to Verno, Paladigm Group is based in Singapore and is a depository and investment shareholding group established and controlled by Aidan with investment ties to the United States. *Id.* ¶ 43.  Aidan is a majority owner of the funds invested through the Paladigm Group.  The group was first created to invest money Aidan made through other projects around the world, including through telecom and banking deals in Nepal and Cambodia, but now also reportedly invests money on behalf of other high-profile individuals from Kazakhstan.

Evidence uncovered in the investigation confirms that the Paladigm Group includes a number of subsidiaries, but the two main companies appear to be Paladigm Capital PTE LTD ("Paladigm Capital")—an active asset and wealth management fund based in Singapore—and its 100% shareholder Paladigm Holdings PTE LTD ("Paladigm Holdings").  Moscow Decl. ¶ 17. Aidan created Paladigm as an investment vehicle for his profits on the privatization of the state-owned telecom system in Nepal.  Makhpal Aff. ¶¶ 38, 43.  In 2016, Aidan and his partners were involved in the sale of telecom assets in Nepal and Cambodia to the Malaysian company Axiata Group for $1.365 billion.  Paladigm Capital is wholly owned by Paladigm Holdings, which in turn is owned and controlled—on paper—by Visor Holding partner Damir Karassayev,[25] who was

---

[25] https://www.italaw.com/sites/default/files/case-documents/italaw8549.pdf

installed as a nominee owner by Aidan.[26]  *Id.* ¶ 43.  According to Singapore corporate records, Paladigm Holdings currently has $4.2 million in paid-up share capital, while Paladigm Capital has $1.2 million.[27]

Advanced Bank of Asia Ltd. ("ABA Bank") was one of the primary banks used by Paladigm Capital.  In 2005-2007, Aidan acquired ABA Bank in Cambodia to provide a vehicle for a deal involving Nepal Telecom.  *Id.* ¶ 43.  Just as he did for Paladigm, Aidan inserted Mr. Karassayev as his nominee owner of the bank.[28]  *Id.* (ABA was sold on to the National Bank of Canada in 2019).[29]  ABA maintains at least two correspondent accounts in Manhattan, at JP Morgan Chase and Standard Chartered Bank.[30]  It is likely that many if not all dollar-denominated transaction activity by Paladigm is conducted through these correspondent accounts.  Moscow Decl. ¶ 23.

The company offers two primary investment funds: Paladigm Ventures Fund 1L Pte Ltd. ("Ventures Fund"), which purports to "invest in and purchase shares of American unicorns and

---

[26] Damir Karassayev has a long history of serving as the minder of Aidan's interests in Asia.  Mr. Karassayev came to Makhpal and Aidan's home in Kazakhstan for a dinner.  At that time, Aidan bragged to Makhpal that while Mr. Karassayev was the paper-owner of ABA Bank, it was Aidan who arranged the purchase of the bank and installed Mr. Karassayev as the owner, and Aidan himself funded the purchase and controlled the bank.  In or around 2017, the Nepal Telecom deal concluded, and Aidan no longer needed ABA Bank.  In 2018, ABA Bank was sold to National Bank of Canada for $200 million.  Mr. Karassayev maintained a position on the bank as well as a small ownership interest.  Aidan's associate Marie-Hélène Bérard was also involved in the sale of ABA Bank of Cambodia to National Bank of Canada.  Affidavit of Makhpal Karibzhanova ¶¶ 43, 46.

[27] Annual Reports for ABA are only available from 2011.  However, the 2011 Annual Report states that the "Visor group" (an investment group created by Aidan) acquired a 100% stake in the bank in 2007.  It is unclear which entity within the Visor group initially bought the asset, but the 2012 Annual Report lists "Visor Growth Fund B.V" as one of the shareholders, along with Damir Karassayev.  https://www.ababank.com/about-aba/annual-reports/

[28] According to the 2011 Annual Report, Damir Karassayev owned 75% of the shares of the bank.  A short biography on page 16 states that he joined ABA in 2008 and curiously makes no reference to his directorship in the Visor group.  As director of Visor, he would have been part of the acquisition of ABA in 2007.  *See* https://www.ababank.com/fileadmin/user_upload/2011_Annual_Report_ABA_english.pdf and https://www.ababank.com/fileadmin/user_upload/Annual_Reports/ABA_Annual_Report_2014_English.pdf

[29] https://forbes.kz//process/how_did_the_ex-president_of_the_kazakhstan_stock_exchange_kase_mr_damir_karassayev_grow_a_bank_in_cambodia_and_why_did_he_sell_it_to_canadians_2/?

[30] https://www.ababank.com/fileadmin/user_upload/International_Money_Transfers/Prefilled_Form_2020/usd.pdf

late stage high-tech companies,"[31] and Paladigm Atlas Fund ("Atlas Fund"), which invests in publicly traded U.S. Treasury bonds and U.S. companies.[32]  Paladigm is listed in SEC filings as an investor in the ride-sharing company Lyft.[33]  Along with the opportunity to invest in those two funds, the company also offers consultancy and advisory services.  Until November 2020, Paladigm also offered investments into a fund called Silverdale SP12 fund which was managed by the Cayman Islands mutual fund Silverdale Fund SPC.  Silverdale SP12 is now closed and the origin of $62 million of assets under its management is unknown.  It previously reported a net asset value of $27 million.[34]  There are no such public figures for Ventures Fund or Atlas Fund. What is public, however, is that Ventures Fund invested in the U.S.-incorporated Lyft, Inc. in June 2018.[35]

The Commissioner, once appointed, will subpoena the U.S. entities and persons with which Paladigm does business, such as Lyft and other U.S. companies, as well as financial institutions and brokerage houses in New York, for records reflecting funds transferred for Paladigm's U.S. investments.

### Visor Group

Arguably Aidan's most public financial asset is a complicated group of international investment companies and advisors, referred to herein as the "Visor Group."[36]  Only a few individuals are fully aware of Visor Group's complete shareholding structure.  Aidan is the beneficial owner of Visor Group, though he has gone to great lengths to keep his stake in the group

---

[31] Venture Fund's website at https://www.employeestocks.com/
[32] https://paladigm.capital/atlas
[33] https://www.sec.gov/Archives/edgar/data/1759509/000119312519059849/d633517dex42.htm
[34] As of November 19, 2019 https://spf.paladigm.capital/; See also, https://www.silverdalegroup.com/wp-content/uploads/20191108-Silverdale-Fund-SP-12-Communique.pdf
[35] https://www.sec.gov/Archives/edgar/data/1759509/000119312519059849/d633517dex42.htm at Schedule A, Schedule of Investors and https://www.sec.gov/Archives/edgar/data/1759509/000095012318012262/filename4.htm
[36] See https://inbusiness.kz/ru/news/ajdan-karibzhanov-visor-uhodit-iz-nepala

private through the use of offshore holding structures and nominees, such as Nikolay Varenko, Vladislav Kim, Michael Sauer, Gulzhamash Zaitbekova, and others.  Makhpal Aff. ¶ 44.  In 2006, Visor Group advertised its aggregate enterprise value as $1.5 billion.[37]

Visor Group entities operate through Kazakhstan, the Kyrgyz Republic, United Kingdom, Russia, the Cayman Islands, and the British Virgin Islands to conduct business and transfer funds all over the world.  Visor Group was founded in 2001 when Aidan set up a private equity firm by the name of AO Visor Investment Solutions ("Visor Investment Solutions").[38]  Visor Investment Solutions quickly became one of the leading brokers for the Kazakh Stock Exchange and began acquiring assets and affiliated companies.  It opened offices around the globe.  In 2004, Visor Group established Visor Capital and secured a banking license in Kazakhstan.[39]  In 2005, Visor Group incorporated TOO Visor Holding ("Visor Holding").  Aidan is listed as Visor Holding's sole director, and Visor Holding has since replaced Visor Investment Solutions as the main holding company for the Visor Group.[40]  A 2019 article in Forbes Kazakhstan described Aidan as majority shareholder of Visor Holding,[41] while a 2017 ruling by a World Bank arbitration panel described Aidan as one of 11 or 12 partners in the Visor Group, all of whom belong to the country's tiny political-business elite.[42]

Applicant believes that documents to be subpoenaed by the Commissioner from the persons and entities discussed within this application will shed light on the Visor Group's activity as one of Aidan's main asset-hiding vehicles.  Makhpal Aff. ¶ 44.

---

[37] *Id.*
[38] https://www.bloomberg.com/news/articles/2015-08-11/kazakh-dealmaker-karibzhanov-finds-riches-peril-in-central-asia
[39] http://www.taucapitalplc.com/wp-content-tau/uploads/Tau-Capital-Admission-Document-0507.pdf
[40] *Id.*
[41] https://forbes.kz//process/how_did_the_ex-president_of_the_kazakhstan_stock_exchange_kase_mr_damir_karassayev_grow_a_bank_in_cambodia_and_why_did_he_sell_it_to_canadians_2/?
[42] https://www.italaw.com/sites/default/files/case-documents/italaw8549.pdf

### *Real Estate Holdings*

Aidan also holds a financial interest in numerous real estate ventures including luxury apartments and homes in New York City, as well as California and New Jersey. These homes are generally not held in his name, but rather in the names of nominees, such as Eduard Ogai, and others. On information and belief, as set forth above, these properties have been purchased with proceeds from Aidan's many business deals, including proceeds from the Koksay Mining deal, East Akzhar oil fields, and the Mubadala investments, among others. *Id.* ¶¶ 41-42, 45, 50-53. In addition, it appears that certain of these real estate investments were undertaken as joint investments by multiple individuals in Kazakhstan. *Id.*

Many of Aidan's transactions were brokered by Edward Mermelstein, a Russian-American New York real estate broker and attorney specializing in representing ultra-wealthy oligarchs from the former Soviet nations in high-end real estate transactions, who frequently works with Aidan and his associates. *Id.* ¶¶ 50-51. Mr. Mermelstein is a licensed real estate broker in New York and is currently employed with One and Only Realty Inc. at 18 East 48th Street, 7th Floor, New York, New York. Mr. Mermelstein has been a registered attorney in New York since 1996 (N.Y. Bar No. 2767242). He provides legal services through Rheem Bell & Mermelstein, LLP at 20 West 36th Street, 12th Floor, New York, New York.[43]

One such property is a luxury apartment purchased in early 2018 at The Heritage at Trump Place, 240 Riverside Boulevard, New York, NY 10069. The unit consists of three apartments that were combined into a single 10,500-square-foot apartment. Saudi Prince Nawwaf bin Sultan bin Abdulaziz Al-Saud was listed as the seller. The purchase price was reported as $36 million. Payment was made through the American bank BOFI Federal Bank of Las Vegas, Nevada, also

---

[43] https://edwardmermelstein.com/

known as the Bank of the Internet, which allegedly has a history of servicing "very high-level officials from major oil-producing countries and war zones."[44]  Aidan and his associates registered three companies specifically for the purpose of purchasing the apartment.  Each entity is registered at the address of Rheem Bell & Mermelstein.  Makhpal Aff. ¶¶ 50-51.  We believe the source of the finding for this apartment will provide further information of Aidan's participation in real estate ventures in the United States and the sources and extent of his wealth.

Assets that Aidan were likewise used to purchase additional properties in New York, including: a 4,000-square-foot apartment at the Plaza;[45] a unit at Cipriani Club Residences;[46] 520 Park Avenue, Apt. 17, New York, NY 10022; and at least one property in New Jersey: a 17,000-square-foot home at 2 Margo Way, Alpine, New Jersey which sits on more than 3 acres of land. *Id.* ¶ 52.

In 2014, Mr. Ogai, following directives from Kazakhstan, purchased more than five acres of land in Los Angeles located at 60-62 Beverly Park Circle, Beverly Hills, California 90210.  The 10-bedroom, 16-bathroom, 11,204-square-foot villa was purchased for approximately $40 million. In late 2019, it was relisted for sale as two separate properties for approximately $28 million and $30 million.[47]  On information and belief, Aidan holds or held a hidden interest in this property. Makhpal Aff. ¶ 52.  To pry apart the extent of Aidan's holdings in many of these properties, it will be necessary to subpoena closing records, statements of beneficial ownerships, and wire payments for source of funds.

---

[44] *Erhart v. BoFI Holding, Inc.*, Case No. 15-cv-02287-BAS-NLS, 15-cv-02353-BAS-NLS, 2020 WL 1550207 (S.D. Cal. Mar. 31, 2020); https://www.nytimes.com/2015/10/14/business/dealbook/ex-auditor-sues-bank-of-internet.html; https://seekingalpha.com/article/3995393-bofi-panama-papers-criminals-and-exotic-loans-to-high-risk-foreign-nationals
[45] 1 Central Park South, 768 5th Avenue, Apt. 1801, New York, NY
[46] 55 Wall Street, Apt. 702, New York, NY 10005
[47] https://www.yahoo.com/lifestyle/kazakhstani-oligarch-asks-30-million-184526660.html

Aidan controls a Hong Kong-based entity called Meridian Capital Limited ("Meridian"), which is nominally run by two Kazakh bankers.[48]  Through Meridian, Aidan and a number of partners invested tens of millions of dollars in real estate development projects in Manhattan.  *Id.* ¶ 53.  Meridian's investments include projects developed by Manhattan-based luxury residence developer Extell Development.  As confirmed on its website:  "Meridian Capital Limited has invested in a number of Extell-led projects in Manhattan."  These include International Gem Tower in the Diamond District of Midtown.[49]  Subpoenaed records and other investigative steps will reveal the extent to which Aidan has ownership interests in these properties.  Many of these records will be discoverable via subpoena in Manhattan from the offices of Mr. Mermelstein.

The Commissioner, once appointed, will subpoena Extell Development, Mr. Mermelstein, One and Only Realty, Inc., Mr. Ogai, and other realtors involved in the purchase and sale of these properties, as well as financial institutions based in New York for all records reflecting funds transferred through the United States for the purchase of these properties, including:  all account administration documents presented to such financial institutions including disclosures of ownership, funds transfers into and out of such institutions, identities of owners and representatives who may be subpoenaed for further information, representations regarding politically exposed persons, and anti-money laundering controls; and communications between such financial institutions and individuals involved in the purchase of these properties.

### Banking Relationships

Aidan has banking relationships with private bankers throughout the world.  Applicant met personally with many of his bankers, including Credit Suisse (Ramunas Rozgys), Bordier & Cie

---

[48] https://meridiancapitallimited.com/management/legal-investment-general-counsel-team/
[49] https://meridiancapitallimited.com/wp-content/uploads/2019/05/Investments_EXTELL_V20190513_02.pdf

(Alois Sommer), CIM Banque, Julius Baer (Olivier Jacquemoud), CBH Helvetique (Simon Benhamou), HSBC Geneva, BNP Paribas (Marguerite Bérard), Advanced Bank of Asia (ABA) (Damir Karassayev), Halyk Bank (Umut Shayakhmetova), Forte Bank (Bulat Utemuratov, Timur Issatayev and Talgat Kuanyshev), Kaspi Bank (Vyacheslav Kim, Kairat Kelimbetov, Kairat Satybaldy), BTA Bank (Kenes (Kenges) Rakishev), Kazkommertzbank (Nurzhan Subkhanberdin, Sauat Mynbayev, Yevgeniy Feld, Askar Alshinbayev, Nina A. Zhussupova). Makhpal Aff. ¶¶ 46-47, 49. He also had accounts and relationships with many other banks, including Citibank, JP Morgan Chase, UBS, Deutsche Bank, LGT Bank, ING Bank, DHB Bank, Banque Internationale à Luxembourg, EFG Bank, Hellenic Bank, Santander, and Unicredit. *Id.* ¶ 49.

One of Aidan's primary banking institutions is Credit Suisse, specifically the Singapore and Zurich branches. Aidan has both personal accounts (including savings accounts) in his name as well as business accounts for companies of which he is the ultimate beneficial owner, such as Paladigm and its funds. On information and belief, Aidan also maintains private banking accounts through nominees at Credit Suisse. *Id.* ¶¶ 46, 47-48.

Aidan's banker at Credit Suisse is Ramunas Rozgys. *Id.* ¶ 47. Makhpal personally met Mr. Rozgys a number of times, at Aidan's request, always in Singapore. Aidan set up these meetings for Makhpal to open a Credit Suisse account that could be used to send and receive assets from his business activities. In one such meeting, Mr. Rozgys told her that they (Credit Suisse) had invested Aidan's money "very well" and that Aidan makes about 8% profit every year. Mr. Rozgys gave Makhpal the impression that Aidan keeps a significant amount of money at Credit Suisse. For example, a $10 million transfer, which Mr. Rozgys discussed with Makhpal, was treated by Mr. Rozgys as typical. Moreover, Mr. Rozgys confirmed a story that Makhpal had heard from Aidan, that Aidan once earned $10 million in one day trading short positions on the

stock exchange.  Makhpal also met with Mr. Rozgys' assistants, with Dee Jee Cheng, a senior assistant relationship manager; and Tze Yang Tan, a relationship manager, both at Credit Suisse's Singapore office.  Makhpal Aff. ¶ 47.

As another example, at the Zurich branch of Credit Suisse, bank accounts were opened for an offshore company, Handoxx Inv. Ltd, which was controlled by Aidan, together with members of the Kazakh elite, through a network of other offshore entities and funds, such as Compass Global Investments Closed Unit Investment Fund, Silverstand Bay Limited, Repulse Bay Limited and others.  These accounts were opened specifically to receive funds from the privatization of oil and gas fields in Kazakhstan, as well as from the sales of Kazakh oil.  Millions of dollars passed through these accounts, which were later used to purchase real estate properties in the United States, United Kingdom, Switzerland, France, as well as to fund purchases of business jets, and other luxury items.  *Id.* ¶ 48.

The Commissioner, once appointed, will subpoena records from Credit Suisse's American headquarters in New York for all accounts held, directly or indirectly, by Aidan or his nominees, for all records reflecting funds transferred through the United States; all account administration documents presented to such financial institutions including disclosures of ownership, funds transfers into and out of such institution, identities of owners and representatives, representations regarding politically exposed persons, and anti-money laundering controls, and communications between, sent or received by Mr. Rozgys or other Credit Suisse employees to facilitate financial transactions in which Aidan has an interest.  The Commissioner will also subpoena records pertaining to U.S. dollar transfers originating from accounts Aidan possesses around the world that passed through correspondent banks located in Manhattan.

### *Expenditures of Funds*

Aidan pays for travel and other expenses for service providers in New York, and also uses credit cards located in Manhattan.  For example, throughout the marriage, Aidan held an American Express Centurion Card (also known as the American Express Black Card) which he used to make large purchases around the world.  Makhpal Aff. ¶ 54.  American Express is headquartered in New York at 200 Vesey Street, New York, New York 10285.  On information and belief, Aidan continues to utilize credit cards issued by American Express and may provide extra cards to those directly associated with him.  The statements from these cards will shed light on Aidan's personal and corporate transactions, dealings, and assets in the United States as well as abroad.  Payments effected to American Express will reveal more about the bank accounts under Aidan's control.  Moscow Decl. ¶ 21.

In addition, Aidan has effected payment to service providers and merchants in Manhattan.  Once again, subpoenas to such vendors will be relevant to identify Aidan's assets and bank accounts.

Aidan has also effected payments in the United States to pay for various expenses related to his extramarital lovers and friends, as well as payments to sex workers in New York.  Makhpal Aff. ¶¶ 16, 55; and Moscow Decl. ¶ 22.  Applicant has in her possession communications and information confirming the expenditure of large sums of money paid to such persons directly for sexual services.  Makhpal Aff. ¶ 16, 55; and Moscow Decl. ¶ 22.  The significant amounts of money that Aidan spent in this regard are indicative of the vastness of his wealth.

The Commissioner, once appointed, will subpoena records from American Express and other banks and credit card providers in Manhattan, as well as from merchants and vendors, for all

accounts held, directly or indirectly, by Aidan and his designees, including monthly statements, account administration documents, and records of payments received to settle monthly accounts.

### C.   Evidence Likely Possessed

Aidan's wealth is distributed in many countries around the world and is often held through nominee owners and shell companies.   Of course, this makes tracing his wealth extremely difficult—but not impossible.   Moscow Decl. ¶ 14.   There are certain aspects of Aidan's wealth subject to discovery, particularly given Makhpal's knowledge of his wealth, business practices, and associates.   Certain business associates are to be found within the jurisdiction of the United States and the venue of this Court.   So too are records relating to the purchase of real properties and other financial investments.   There are records relating to securities filings that also must be maintained in the United States that may be found in Manhattan.   Aidan has U.S.-issued credit cards that will reveal the extent of his spending, the assets he has acquired, and the banks he uses to pay his expenses.   Many of his assets are in dollar-denominated accounts, and clearing records from correspondent banks will show the origination and destination of U.S. dollar wire payments. Finally, certain assets consist of U.S. securities, and subpoenas to custodians and transfer agents will help establish his hidden beneficial ownership of such assets.

### LEGAL ARGUMENT

Applications for judicial assistance under 28 U.S.C. § 1782 should be freely granted in the interest of justice and comity.   *See  Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).   Section 1782 applications must meet three statutory requirements.   *See Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015).   If an application meets the statutory requirements, courts consider four discretionary factors pursuant to § 1782's twin aims of "providing efficient means of assistance to participants in international litigation in our federal courts and

encouraging foreign countries by example to provide similar means of assistance to our courts."

*Id*. at 297-98 (internal citation omitted).[50]

## I.    THE APPLICATION MEETS THE FACTUAL REQUIREMENTS OF 28 U.S.C. § 1782

The requirements of Section 1782 are straightforward:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).  Thus, § 1782 imposes the following requirements for a discovery subpoena: "(1) the person from whom discovery is sought resides (or is found) in the district of the the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *Mees*, 793 F.3d at 297 (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)).  This application meets those requirements.[51]

---

[50] Notably, the Republic of Kazakhstan itself has used this Court's powers under § 1782 to avail itself of discovery in the United States.  In *In re Application of Republic of Kazakhstan*, this Court granted Kazakhstan's request to subpoena documents from the New York office of a U.K. law firm.  110 F. Supp. 3d 512 (S.D.N.Y. 2015).  Kazakhstan, therefore, has an indisputable interest in the granting of § 1782 applications to support pending or anticipated actions before foreign tribunals.

[51] *Ex parte* applications for discovery are proper.  "[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*. The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)."  *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) (affirming application granted *ex parte*).

A.   **Respondents "Reside" and Are "Found in" This District Because They Live in or Do Business in the Southern District of New York.**

As set forth above, Aidan directs an international network of people, companies, and accounts that transfer billions of dollars around the world.  The Southern District of New York is the situs of many of those activities.  The Commissioner, once appointed, will subpoena records from persons, entities, and/or financial institutions connected to Aidan who are properly "found" in New York for the purposes of this application.  Many respondents are physically located in New York.   For example, the Commissioner anticipates issuing subpoenas to Mubadala Investment Co., JP Morgan Chase, Credit Suisse, American Express, and companies controlled by or affiliated with Edward Mermelstein, each of which is either headquartered in or maintains an office or employees in New York City.  Such potential respondents are, therefore, "found" in New York for the purposes of § 1782.  *See, e.g., In re Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. sec. 1782*, 110 F. Supp. 3d 512, 515 (S.D.N.Y. 2015) (respondent found in district under § 1782 because it worked in the district); *In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 WL 3844464, at *4 (S.D.N.Y. Dec. 29, 2006) (finding a global company headquartered in New York is "found" within the district for purposes of § 1782).  The records sought by Applicant are reasonably believed to be within respondents' possession, custody, or control in New York.[52] Similarly, there are vendors in New York whose payment records will identify bank accounts and credit cards relevant to Aidan's wealth.

---

[52] Applicant understands that should she seek approval to subpoena documents from parties outside of the Southern District of New York she will be required to file additional § 1782 applications in the appropriate jurisdictions.

### B.   The Applicant's Requested Discovery is "For Use in a Foreign Proceeding" in Kazakhstan.

Applicant requests this discovery for use "in a proceeding" before "a foreign . . . tribunal." 28 U.S.C. § 1782.  In analyzing this aspect of § 1782, courts have focused "on two questions: (1) whether a foreign proceeding is adjudicative in nature; and (2) when there is actually a foreign proceeding." *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998).  Both requirements are clearly fulfilled here where Applicant's requested discovery is for use in a foreign adjudicative proceeding in Kazakhstan.

The existence of a foreign proceeding for purposes of the § 1782 analysis is clear.  Makhpal's divorce was finalized in Kazakhstan without an order for division of marital assets.  As confirmed in the Affidavit of Yevgeny Tikhonov, under the laws of the Republic of Kazakhstan, Makhpal has a legal right to an equitable division of the marital assets acquired during her marriage to Aidan. Tikhonov Aff. ¶ 7.  Kazakh law provides for a three-year statute of limitations to commence such an action. *Id.* ¶ 8.  Thus, Makhpal is within her legal rights to seek her due share of the assets in court. *Id.* ¶ 9.

Makhpal retained counsel in Kazakhstan and, on April 22, 2021, commenced an action for equitable division of marital property within the three-year limitation period.  A copy of the Kazakh filing is attached hereto as Ex. A to the Affidavit of Makhpal Karibzhanova.  The matter was filed in a court of first instance, meaning a trial court.  The Kazakh court of first instance is squarely within the purview of § 1782.  *See Intel*, 452 U.S. at 258 (internal citation omitted) (acknowledging that the "term 'tribunal'… includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal and administrative courts.").  Kazakh courts of first instance have jurisdiction to render judgments in serious cases, such as the proceeding filed by Makhpal.  Courts of first instance accept and review written pleadings and

documentary evidence and hear live testimony, and will receive into evidence such materials as the parties may introduce to prove the value of the marital estate.   Kazakh law provides that foreign evidence may be used in domestic Kazakh marital property proceedings to prove the value of foreign assets.   Tikhonov Aff. ¶ 10.

There can be no question that this already-commenced litigation is adjudicative in nature, and hence constitute "proceeding[s]" pursuant to the two-prong *Euromepa* analysis.   The requested discovery is thus "for use in a proceeding before a foreign or international tribunal" within the meaning of § 1782.

### C.   Applicant is an "Interested Person," Since She Will Be the Plaintiff in the Kazakh Civil Proceeding.

Applicant is plainly an "interested person" for purposes of § 1782.   There is no question that the statutory term "interested person" encompasses parties to a foreign litigation.   *See* 28 U.S.C. § 1782 (captioned "Assistance to foreign and international tribunals and to *litigants* before such tribunals") (emphasis added);   *Intel*, 542 U.S. at 256 ("No doubt litigants are included among . . . the 'interested person[s]' who may invoke § 1782.");   *Application of Malev Hungarian Airlines*, 964 F.2d 97, 101 (2d. Cir. 1992) (noting that the phrase "upon the application of any interested person" was inserted into Section 1782 "as part of the effort to liberalize the assistance provided by American courts to foreign and international tribunals").   Makhpal is the plaintiff in the Kazakh civil proceeding and is thus an "interested person."

Having satisfied all three prongs of the statutory requirement of § 1782, the focus shifts to the discretionary factors prescribed by the Supreme Court in *Intel*.

## II.   THE APPLICATION SHOULD BE GRANTED IN THE EXERCISE OF THE COURT'S DISCRETION.

The granting of this application for judicial assistance is an appropriate exercise of this Court's discretion in aid of the deliberations of the Kazakh courts.  *Intel* sets forth factors to be considered in exercising discretion under § 1782.  First, a favorable exercise of discretion is most warranted where, as here, many of the entities from which discovery is sought are not party to the foreign proceeding, because such "may be outside the foreign tribunal's jurisdictional reach" and "their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Intel*, 542 U.S. at 264.  The respondent entities described in and anticipated by this application are unlikely to be subject to the disclosure power of the Kazakh courts.[53]

Second, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."  *Id.*  The Kazakhstan proceeding is an appropriate subject of judicial assistance.  As discussed above, the Kazakhstan proceeding is quintessentially adjudicative, and there is no indication that the Kazakh courts would be unreceptive to requests from U.S. courts for judicial assistance.  There is no doubt that the production of the requested information will facilitate a faster resolution of the proceedings in Kazakhstan and allow action to be taken to prevent further dissipation of assets.

Third, the *Intel* court has stated that the district court may consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States" and whether the discovery requests are "unduly intrusive or burdensome."  542 U.S. at 265.  The present application seeks neither to circumvent foreign disclosure

---

[53] The government of Kazakhstan's use of this Court's § 1782 powers to obtain discovery from an American law firm rather than obtain it through a mechanism under its own laws raises the specter of the limits of the Kazakh discovery powers.  *See In re Republic of Kazakhstan*, 110 F. Supp. 3d 512.

restrictions nor to impose onerous or unnecessary burdens on respondents, and it is unlikely to do so. Rather, the application seeks authorization to (i) issue subpoenas *duces tecum* that are narrowly tailored for the production of corporate and banking documents critical to Applicant's claims in the Kazakhstan proceedings from entities that are not party to the Kazakhstan case, and (ii) take deposition testimony critical to the preparation of Applicant's case from entities that are not parties to the case.  The discretionary factors articulated by the Supreme Court all weigh heavily in favor of granting this application.

## CONCLUSION

WHEREFORE, Applicant respectfully submits that the Application for Judicial Assistance should be granted and that a Commissioner of the Court should be appointed with the authority to issue subpoenas seeking (i) relevant testimony and documents as may be found within the jurisdiction of this Court, including testimony from bankers, accountants, and business associates; (ii) documents pertaining to companies and bank accounts associated with Aidan and his nominee owners; and (iii) correspondent banking records and records relating to securities ownership, custodianship, and transfers, and documentation and testimony relating to real estate holdings.

Dated:  May  12, 2021                                          Respectfully submitted,

/s/ John W. Moscow
John W. Moscow
Adam S. Kaufmann
A. Mackenna White

LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
The Chrysler Building
405 Lexington Avenue – 64th Floor
New York, NY  10174
Tel: (212) 826-7001
Fax: (212) 826-7146
*john.moscow@lbkmlaw.com*
*adam.kaufmann@lbkmlaw.com*
*mackenna.white@lbkmlaw.com*